## JAMES *v.* STATE

[No. 316, September Term, 1965.]

*Decided April 29, 1966.*

The cause was argued before PRESCOTT, C. J., and MARBURY, OPPENHEIMER and McWILLIAMS, JJ., and CHILDS, J., Associate Judge of the Fifth Judicial Circuit, specially assigned.

*Edward A. Palamara* for appellant.

*Edward L. Blanton, Jr., Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General,* and *Leonard T. Kardy, State's Attorney for Montgomery County,* on the brief, for appellee.

CHILDS, J., by special assignment, delivered the opinion of the Court.

On August 14, 1963 at 12:45 P.M. the appellant, a resident of Washington, D. C. and one Frank Gorham were apprehended by the Montgomery County police in the act of ransacking a private residence in Silver Spring.

Linda Wehunt, age 15 years, testified that she was alone in her residence when she heard a knock at the front door. She looked out and saw the appellant and a man later identified as Gorham, but having been instructed never to answer the door to strangers in her parents' absence, she did nothing.

After several knocks, the appellant and his accomplice got into their car which was in the driveway, drove about sixty feet away from the residence and parked. Several minutes later they returned and again knocked on the front door. Upon receiving no response they went to the rear door and knocked. From thence, they went to the side entrance and when their knocks again went unanswered they broke the glass in the door and entered.

The witness, terrified by these activities, ran to her bedroom and crawled under the bed. Fortunately, there was a phone in her bedroom, and while the intruders were engaged in looting the downstairs, Linda phoned the police. In the time intervening between her call and the arrival of the police, appellant and Gorham stacked in the upstairs hall two suit cases, a shotgun, radios, record player, clocks, a jar of money and suits, preparatory to transporting these articles to their car. During the course of their depredations they had even moved the bed under which Linda was hiding, but were unaware of her presence.

On arraignment, the Defendant pleaded not guilty to a charge of housebreaking; however, at the trial at which he was represented by counsel, he, before Judge James H. Pugh, stated that he desired to withdraw his former plea and enter a plea of guilty. The colloquy which ensued is as follows:

> THE COURT: Arthur Samuel James, stand up. At the time of your arraignment on information in this case you plead not guilty. Your counsel now informs me that you wish to change that plea of not guilty to guilty, is that correct?
> THE DEFENDANT: Yes Sir.
> THE COURT: You understand the nature of the charge?
> THE DEFENDANT: Yes Sir.
> THE COURT: What is it? What is that?
> THE DEFENDANT: Plead guilty.
> THE COURT: What are you charged with?
> THE DEFENDANT: Housebreaking.
> THE COURT: Housebreaking?
> THE DEFENDANT: Yes Sir.

THE COURT: You know the possible consequences for a plea of guilty to housebreaking?
THE DEFENDANT: Yes Sir.
THE COURT: How old are you?
THE DEFENDANT: Twenty-three.
THE COURT: What's that?
THE DEFENDANT: Twenty-three.
THE COURT: Your counsel has advised you of the consequences or possible consequences of a plea of guilty of housebreaking?
THE DEFENDANT: Yes sir.
THE COURT: All right, enter the plea of guilty.
Call the witness.

During the course of the testimony in which the Defendant participated the Court made a point of asking where the Defendant was from and was told Washington. He then inquired if the Defendant were born and raised in Washington. At the end of the case, sentencing was deferred pending a probation report which revealed that James had previously not incurred a criminal record in Maryland, but had several minor infractions listed against him in the District of Columbia.

The Court, after reviewing the report, sentenced the traverser to ten years' confinement in the Maryland Penitentiary. This sentence, of course, is permitted by statute for this type of housebreaking. Frank Gorham was later sentenced to three years for his participation in the crime by another judge.

A part of the court's remarks during sentencing were as follows:

"I don't know what you were thinking about when you went into this house, except one thing; that is, to go in there and steal. This little girl underneath the bed just waiting, shivering and frightened to death, you two men in that house.

"The Legislature of Maryland has changed, or made an offense of breaking in a dwelling house in the day time housebreaking. [If] this were at nighttime it would be burglary. But it is burglary in the daytime, and burglary in the daytime, to this Member of

the Court, is the same thing as burglary at nighttime, where you sneak in this place and try to burglarize and do in fact burglarize the house with the little girl there. I don't know what you would have done if that little girl had made her presence known.

"The Court has no sympathy with you, and (is) not going to give you any. * * *."

The appellant presents three questions for our consideration, but they may conveniently be disposed of under two headings. First, did the trial judge have sufficient information or evidence to show that the accused voluntarily wanted to change his plea of not guilty to guilty, and that the accused understood the nature and consequence of a guilty plea? Second, was the maximum sentence imposed on the appellant influenced or determined by improper motives of the sentencing judge?

## I

### The Change of Plea.

Although there is authority in the federal court system and our own that the *voluntary* nature of a defendant's plea must be clearly established prior to a court's accepting a guilty plea, we know of no Maryland case nor do our own rules of procedure require any specific ritual to be followed by a trial judge in order to satisfy himself of the voluntary character of the plea and of the fact that the defendant understands the nature and effect of a plea of guilty. Formerly, a plea of guilty by a defendant represented by counsel and capable of participating in his own defense was accepted almost as a matter of course in Maryland. *Jones v. State,* 221 Md. 141, 156 A. 2d 421; *Adams v. State,* 224 Md. 141, 167 A. 2d 94. And, we have consistently held that a plea of guilty may be entered under circumstances showing a voluntary desire on the part of the accused to do so, with an intelligent understanding of the nature of the offense to which he is pleading guilty and the possible consequences of such a plea. The acceptance of such a plea will not be set aside on appeal. *Cooper v. State,* 231 Md. 248, 189 A. 2d 620; *Gleaton v. State,* 235 Md. 271, 201 A. 2d 353. Although we consider the inquiry as to the voluntary nature of the plea undertaken by the trial judge in this case as verging

upon the minimal, we are not prepared to go so far as to hold that an accused, who is represented by experienced counsel and who has, by the accused's own admission, advised him on the possible consequences of a guilty plea, must be further advised by the court on a subject of which the accused already professes knowledge. Of couse, there is no objection to the trial judge's making further inquiry, and most of them, as a precautionary measure, are doing so. We are not yet committed to the principle that the court is required to assume the role of co-counsel to the defense. We hold that there was no prejudicial error in the acceptance of the guilty plea.

## II

### Was the Sentence Influenced by Improper Motives?

Appellant urges that all citizens of the United States are entitled to equal protection and due process of law. He cites the Fourteenth Amendment of the United States Constitution and Article 23 of the Maryland Declaration of Rights. Appellant asserts that "* * * a sentence imposed by a Court, motivated by a desire to discourage citizens from other states or territories from *freely* coming into the State of Maryland contravened the law of the land and is, therefore, improper and should be set aside." Such a statement verges upon an implication that Judge Pugh had violated the Commerce Clause as well.

We are not aware of any provision in either the Federal Constitution or the Declaration of Rights of this State which would afford protection to the free exercise of interstate housebreaking. The law itself makes no distinction between Maryland housebreakers and "foreign" housebreakers. There is nothing in the record to show that Judge Pugh increased the sentence because the traverser was from out of state.

Although the remarks of the trial court on sentencing the traverser might possibly be construed as an indication that he intended to impose sentence as though appellant had been guilty of burglary, the actual sentence tends to negate such a suggestion. The burglary statute, Code (1957), Article 27, Section 29, provides for a sentence up to twenty years.

Where punishment is prescribed by statute and the sentence does not exceed statutory limits, this Court ordinarily cannot

review it even on direct appeal. *Merchant v. State,* 217 Md. 61, 70, 141 A. 2d 487. The narrow exception which this Court has recognized is that where the punishment is grossly and inordinately disproportionate to the offense to such an extent that the sentence is evidently dictated not by a sense of public duty, but by passion, prejudice, ill-will or any other unworthy motive, such a sentence will be reviewed by this Court. *Reid v. State,* 200 Md. 89, 88 A. 2d 478, *cert. den.* 344 U. S. 848; *Reynolds v. Warden,* 229 Md. 623, 182 A. 2d 875; *Swan v. State,* 200 Md. 420, 90 A. 2d 690. The record here presented does not call for an application of the exception noted. We fail to find any unworthy motive, or lack of a sense of public duty on the part of trial judge. We hold that the sentence imposed was within the permissible statutory limits and not actuated by improper motives; hence it was lawful. And the length of the sentence received by his co-defendant does not alter the situation. *Patterson v. State,* 236 Md. 649, 205 A. 2d 217.

Appellant included in his brief excerpts from two purported articles in a local newspaper of professed statements which had been made by Judge Pugh relative to criminals from Washington plying their "trade" in the county. The excerpts are not included in the transcript and were placed in appellant's brief without requested, or granted, leave of any court. We know of no authority for such procedure. In reading the briefs, we have, of course, read the excerpts (and we see nothing of undue significance therein); however, we have not considered them in this opinion for the above reason.[1]

It comes as cold comfort to the appellant to learn that the Legislature in 1966 passed House Bill 159 providing for the review of criminal sentences. However, the act, which seems tailor-made for problems similar to that of the appellant, by its own terms limits its applicability to those cases wherein a conviction has been found after the effective date of the legislation which is to be July 1, 1966, if signed by the Governor.

*Judgment affirmed.*

---

1. We note in passing that no request or demand was made that Judge Pugh disqualify himself.