GEORGE F. HOYT ᴇᴛ ᴀʟ. *v.* POLICE COMMISSIONER
OF BALTIMORE CITY

[No. 40, September Term, 1976.]

*Decided January 6, 1977.*

The cause was argued before SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ., and JAMES C. MORTON, JR., Associate Judge of the Court of Special Appeals, specially assigned.

*William H. Engelman,* with whom were *Kaplan, Heyman, Greenberg, Engelman & Belgrad* and *Robert M. Winegrad* on the brief, for appellants.

*Millard S. Rubenstein, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellee.

SINGLEY, J., delivered the opinion of the Court.

These consolidated appeals, by 55 former members (the Officers) of the Baltimore City Police Department (the Department), are from an order of the Baltimore City Court which affirmed the action of Donald D. Pomerleau, the Police Commissioner of Baltimore City (the Commissioner), who had dismissed the Officers from the Department because of their participation in a strike against the Department from 11 July 1974 through 16 July 1974. The appeals were initially taken to the Court of Special Appeals. We granted the Officers' petition for the writ of certiorari before the case was heard in that court.

Prior to October, 1973, members of the Department had been represented by two organizations, the Fraternal Order of Police and Local 1195 of the American Federation of

State, County and Municipal Employees, AFL-CIO (the Union). In that month, the Commissioner agreed to conduct an election among those members of the Department holding the rank of police officer or police agent to determine whether they wished to be collectively represented and if so, to choose one of the two labor organizations to do so. It was agreed that the organization thus selected would negotiate with the Mayor and City Council of Baltimore City (the City) on matters of salaries and other benefits.

General Order 9-73 of the Department, promulgated by the Commissioner on 10 October 1973, announced that an election was scheduled on 14 November 1973 for the selection of an employee organization and stated that the organization so selected would have exclusive collective bargaining rights for no less than two years.

The order concluded with the following proviso:

> "No employee organization or employee shall engage in, initiate, sponsor, support or direct a strike, secondary boycott, 'blue flu epidemics', work slow downs, work stoppages, or similar activities.
>
> "No employee organization or employee shall engage in, initiate, sponsor, support, directly or indirectly, the picketing of Police installations or any of the property of the City of Baltimore.
>
> "If the employee organization shall violate any of the provisions hereof the Police Commissioner will:
>
> (a) revoke the designation of an exclusive representative and said exclusive representative shall be ineligible to participate in elections or be certified as exclusive representative for a period of two years thereafter; and
>
> (b) subject to the approval of the Mayor, City of Baltimore, payroll deductions will not be made for such organization's dues for a period of two years thereafter."

At the election, the Union was selected as the exclusive bargaining agent. Commencing in January, 1974, the Union

initiated negotiations with the City, looking toward the formulation of a contract for the fiscal year beginning 1 July 1974. The negotiations were not successful, and the City's final offer, presented on 30 June 1974, was almost unanimously rejected by the members of the Union.

Negotiations continued but no agreement was reached. Two meetings of the membership were held on 6 July. It was decided to form an 84 member Steering Committee to plan a series of "job actions" designed to stimulate negotations: a drastic increase in the issuance of traffic summonses, and the writing of detailed reports on found property, including pennies and abandoned bath tubs. The "job actions" apparently had the tacit approval of the Commissioner, who hoped to see a resumption of negotiations, and the Department cooperated with the Union by arranging for members of the Steering Committee to be relieved from duty in order that they might attend meetings of the Steering Committee.

At the last of these meetings, held at 1:00 p.m. on 11 July, it was decided to call a strike. The strike began in the Department's Southwestern District at 8:00 p.m. when 39 officers on the 4:00 p.m. to midnight shift returned to the police station, turned in their equipment, and were followed by 33 members of the Tactical Section.[1] Officers walked off their jobs in almost every district, so that by 11:30 p.m. 162 men were out. On subsequent days, others refused to report for duty so that ultimately the total number participating in the strike was 901. This was 36% of the number of patrolmen in Baltimore City, Baltimore *Sun*, 13 July 1974, at A. 9 col. 1 (final edition).

At about 11:15 p.m. on 11 July, Judge James Murphy, of the Circuit Court of Baltimore City, issued an injunction prohibiting the strike, and directing that striking officers return to work. This was read at roll calls and to officers on picket lines, and after the strike had ended, the court fined

---

1. The Southwestern District, an area of 9.5 square miles, has a population of 93,000 to 98,000, and is approximately the size of Miami Beach, Florida. At this point, there was but one uniformed officer on duty in the District.

the Union $25,000.00 and the Union's Executive Director $10,000.00 for contempt.

On 14 July, the Commissioner unilaterally terminated the employment of some 91 probationary officers who were on strike. Most of these were later reinstated.

While the strike was in progress, counsel for the Union met on two occasions with the Commissioner, members of his staff and his counsel, to ascertain what disciplinary measures might be imposed upon the striking officers. The Commissioner indicated that he proposed to impose disciplinary measures in varying degrees, depending upon the type of activity in which the officers had engaged and the degree of leadership exercised by each of them.

The strike ended on 16 July. On the following day, the Commissioner notified the Executive Director of the Union, Thomas A. Rapanotti, that the recognition of the Union as exclusive bargaining agent had been revoked and that check-off of dues would cease.

On the same day, the Commissioner spoke to Deputy Commissioner Clarence J. Glauser, who was Deputy Commissioner for Administration in the Department, and, according to Glauser, instructed him "to head up and establish a special unit to look into the activities of the various members of the Department as relate[d] to their conduct during the strike; and to collect . . . [information] . . . and make recommendations concerning their participation in the strike activity with a view towards discipline action in each case." Thereafter, this unit opened files for each of the officers who took part in the strike, in which was placed such information as related to the extent of the participation of each officer.

Deputy Commissioner Glauser testified that, generally speaking, the files were divided into several categories: first, those officers who were officials of the Union, members of the Executive Board and of the Steering Committee or shop stewards; second, those officers assigned to the Southwestern District and to the Tactical Division who left their duty posts commencing at 8:00 p.m. on the evening of 11 July; third, those officers who left their posts in other

districts; fourth, those officers who had made public statements or had coerced others to strike; and finally, those officers who had been engaged in threatening or intimidating activity on the picket line or were intoxicated or resorted to vulgar or violent conduct.[2]

The preparation of the files occupied a period of approximately three months. As the files were completed, Deputy Commissioner Glauser determined which officers

---

**2.** On 25 July, the Commissioner had issued a notice to be read at roll calls for three consecutive days and posted on all bulletin boards in the entire department:

"This message is intended to answer some questions uppermost in the minds of those members of the department who participated in the strike against the city. First, exhaustive case files are being prepared on each officer involved. As these are completed, please be assured that varying actions will be taken on an individual basis against 1) those officers from the Southwestern District and Tactical Section who deserted their posts at or about 2000 hours on Thursday, July 11, abandoning the citizens and endangering their brother officers, 2) those who instigated, planned, and implemented the walkout of Tactical and Southwest, 3) those who conspired to diminish the department's ability to respond by:

    a.   jamming communications
    b.   mixing keys in the Motor Pool
    c.   blocking departmental [buses] so reinforcements could not move expeditiously, and
    d.   holding open mikes

4) those who exhorted and even coerced other officers to strike, 5) and those who spat upon their brother officers. *These men will be dealt with.*

"However, there remains a larger group of strikers who remained away from their jobs but were not instigators of or leaders in the strike. For the most part they were followers, deceived, misguided and sorely misled by union leadership. It is primarily for this latter group of men that this communication is prepared. To you I say, go back to policing and worry no longer. Each of you will receive from me a letter of reprimand that will become a part of your personnel file. I have decided that beyond this I will take no further action against you for your role in the strike. Of course, you must live with the shame that you brought upon yourselves, the Baltimore City Police Department, and law enforcement on a national basis. However, I trust that you will emerge from our recent trauma stronger men and better police officers.

"With the above information, each man involved in the strike — knowing his own actions — will be able to discern which of the above classes of strikers he falls in. I feel this should relieve many fears and anxieties you have. So, to the large group of officers who were the followers, let me reiterate — stop worrying and get back to policing this city." (emphasis in original)

should be charged and which officers were guilty of conduct which would justify only a severe reprimand. The files of the officers to be charged were delivered to the office of the Attorney General, who by law is the legal representative of the Commissioner, Code of Public Local Laws of Baltimore City (1969), § 16-15, where charges and specifications were prepared and the cases assigned for hearing before Disciplinary Hearing Boards (the Boards or the Board), consisting of three senior officers appointed in accordance with General Order 70-04 of the Department, as amended 1 July 1974, and Chapter 722 of the Laws of 1974, effective 1 July 1974, the Law Enforcement Officers' Bill of Rights, now Maryland Code (1957, 1976 Repl. Vol.) Art. 27, §§ 727-734.

The first of the disciplinary actions was instituted on 23 July. Thereafter, similar actions were instituted against what ultimately became a group of 170 officers whose removal from the force was sought.[3] All of the officers thus charged were suspended from duty and hearings were scheduled before the Boards until December, which heard the evidence in each case and made formal recommendations to the Commissioner as regards the disciplinary action to be taken.[4]

The Boards followed what was essentially a two-step procedure. In the first phase, the Boards heard evidence relating to the charges and specifications against each officer and made findings of innocence or guilt. If an officer was found guilty on one or more charges, he was accorded an opportunity to present evidence in mitigation or

---

**3.** As it turned out, of 25 Union officials, only the 19 who actively participated in the strike were charged. One of these resigned; one was dismissed and took no appeal; five were ultimately reinstated, and the remaining 12 are appellants in this case. Of the 84 members of the Steering Committee, 61 were active participants in the strike; 27 members were disciplined without being the subject of formal charges. Disciplinary sanctions were imposed on officers who were members of the Committee arising out of other charges.

**4.** The lower court found as a fact that of the 901 officers who participated in the strike, 673 received letters of reprimand and 130 were suspended from duty and formally charged. Six probationary officers were dropped from the force. Of the 130 officers charged, 75 (including the 55 appellants) were dismissed from the Department; 90 other officers resigned before a hearing, and the charges against the others were either dismissed or a lesser disciplinary sanction was imposed.

extenuation, following which the Boards made a recommendation to the Commissioner as to the punishment to be imposed.

In most of the hearings before the Boards, the facts were stipulated. Evidence which was heard in mitigation or extenuation was, in 15 cases, extensively summarized; in 7 cases, minimally summarized; in 21 cases, only the names of the Officer's witnesses were listed, and in 11 cases, no reference was made to the favorable testimony. However, in each case counsel for the Officers was accorded an opportunity to summarize evidence in mitigation or extenuation in a letter to the Commissioner.

In the cases of the 55 appellants here involved, the Commissioner accepted the Trial Boards' recommendation that they be dismissed from the force.[5] The Officers appealed to the Baltimore City Court, which heard additional testimony, and affirmed the dismissals. This appeal followed.

At this juncture, the facts found by that court should be set forth:

"During the period between 2000 hours, July 11, 1974, and 2400 hours, July 12, 1974, there were 276 burglaries of commercial establishments, 52 lootings and 80 acts of malicious destruction. Additionally, there were 233 serious crimes committed between 8:00 p.m., July 11, 1974, and 4:00 p.m., July 12, 1974, an increase in crime of some 258% over the same period the day before. Still further, during this period of time, the Communications Division received 4,266 calls for service over emergency telephone lines, an average of 533 calls per hour. An additional 953 calls could not get in as all the lines were busy. Of the 4,266 calls received, 1,364 requested or required a police response.

---

5. At argument before us, the Commissioner's counsel told us that in no case did the Commissioner impose a punishment more severe than that recommended by the Disciplinary Hearing Board, and that in a number of cases, the Commissioner imposed lesser sanctions.

"On the day the strike began, an Order was issued in the Circuit Court of Baltimore City enjoining the Union and its members from striking against the Department. The Union failed to comply with the Court Order, and the strike lasted until July 16, 1974, involving a total of 901 Police Officers.

"Following the strike, on July 17, 1974, the Commissioner imposed sanctions on the Union by revoking its [exclusive] bargaining authority and withdrawing its right of payroll deduction of Union dues. Also on July 17, 1974, in the Circuit Court of Baltimore City, the Union was fined $25,000.00, and its Executive Director, Thomas A. Rapanotti, was fined $10,000.00, both for contempt by reason of their non-compliance with the Order of July 11, 1974."

Based on our review of the record, we are satisfied that these findings of fact were supported by substantial evidence.

The appellants' argument that the order of the Baltimore City Court affirming their dismissal should be reversed or modified is divided into essentially four parts, which will be considered in order. A fifth contention relates to the dismissal of one of the appellants, Officer Wayne Harris.

(1)

Appellants, both permanent and probationary employees, were entitled to procedural due process before their employment with the Department could be terminated.

The thrust of this argument is that the companion cases, *Perry v. Sindermann*, 408 U. S. 593, 599 (1972), and *Board of Regents v. Roth*, 408 U. S. 564 (1972) make it clear that a public employee whose employment is terminated has a property interest in a job which he holds under contract, an interest of which he may not be deprived unless procedural due process, notice and a hearing guaranteed by the

Fourteenth Amendment, is observed.[6] *See also Huntley v. North Carolina State Board of Education,* 493 F. 2d 1016 (4th Cir. 1974); *McNeill v. Butz,* 480 F. 2d 314 (4th Cir. 1973). We do not question the validity of this contention for purposes of this case.

### (2)

Among the specific due process guarantees to which the appellants were entitled was that of an impartial decision maker.

### (3)

Appellants were deprived of an impartial decision maker in these cases because:

(i) There was an impermissible commingling of the investigative, prosecutorial and judicial functions on the part of the Police Commissioner.

(ii) The Police Commissioner, because of his personal stake and involvement in the strike and its aftermath, was not capable of judging these cases fairly.

Assuming that the Officers were entitled to due process, the issue is whether they were afforded it here. Relying on *Goldberg v. Kelly,* 397 U. S. 254, 267-71 (1970), the Officers say that each of them has a right to:

1. Notice which is timely and adequate for the preparation of the Officer's defense;
2. Confront and cross examine adverse witnesses and to present his own case;
3. Be represented by counsel;
4. An impartial decision maker;

---

6. Counsel for the Commissioner seems to have conceded and the lower court seems to have found that there is no substantial difference in this regard between such of the Officers who had permanent status and those who had probationary status only.

5. Be apprised of reasons for the decision and the evidence relied upon.

The underlying issue here is whether the disciplinary procedure was so structured as to guarantee the Officers a fair and impartial trier of fact and a decision maker without bias.

The lower court was satisfied, as are we, that the power to discipline is vested solely in the Commissioner. Code of Public Local Laws of Baltimore City (1969) § 16-7 (7) and (8) respectively provide that the Police Commissioner is authorized:

"(7) To appoint, promote, reduce in rank, grade or position, reassign, reclassify, retire and discharge all members of the Department in the manner prescribed by law.

"(8) To regulate attendance, conduct, training, discipline and procedure for all members of the Department and to make all other rules, regulations and orders as may be necessary for the good government of the Department and of its members."

This grant of authority must be considered, however, in conjunction with § 730 (b) of the Law-Enforcement Officers' Bill of Rights, which provides:

"Conduct of hearing. — The hearing shall be conducted by the investigating committee of the law-enforcement agency by which the law-enforcement officer is employed. Both the law-enforcement agency and the law-enforcement officer shall be given ample opportunity to present evidence and argument with respect to the issues involved. Both may be represented by counsel."

Here, the Commissioner was faced with two requirements: that of performing the duty of the ultimate decision maker imposed upon him by law, and of performing it in a fair and impartial manner. As the court below found, the Commissioner chose not to exercise the investigative

function which was performed by the unit headed by Deputy Commissioner Glauser or the prosecutorial function which was performed by the Attorney General, but to act only in an adjudicative role. The Commissioner isolated himself by directing that the Deputy Commissioner initiate the investigation, convene the Boards and supervise the preparation of charges. The Commissioner's only function was that of accepting, modifying or rejecting the punishment recommended. This was certainly not an impermissible blending of the investigative, prosecutorial and judicial functions, as the Officers contend. *See Withrow v. Larkin,* 421 U. S. 35 (1975). There is no evidence that the Commissioner played any part whatever in the conduct of the investigations or prosecutions nor do we find any evidence that the Commissioner's personal involvement in the strike rendered him incapable of judging the cases fairly.[7]

The facts of this case closely parallel those of *Hortonville Joint School District No. 1. v. Hortonville Education Ass'n,* 66 Wis. 2d 469, 225 N.W.2d 658 (1975), 426 U. S. 482, 49 L.Ed.2d 1 (1976). In that case, the Hortonville teachers who had worked under a collective bargaining agreement during the school year 1972-1973, went on strike in 1974 when no agreement was reached, a strike which was prohibited by Wisconsin law. When the teachers refused to return, disciplinary hearings were scheduled before the Board of the School District. The teachers objected on the ground that this was not a hearing before an impartial fact finder guaranteed by the Fourteenth Amendment. No hearings were held, and the teachers were dismissed.

The Supreme Court of Wisconsin relied on *Morrissey v. Brewer,* 408 U. S. 471, 485-86 (1972), which had held that minimal due process requirements mandate a preliminary determination of whether there is reasonable ground for the revocation of parole by an uninvolved person and upheld the

---

7. It will be recalled that it was the Commissioner who had initiated the plan for the selection of an exclusive bargaining agent by secret ballot. Additionally, he had publicly advocated the adoption of the procedure by other police departments. The record supports the notion that his reaction did not rise above disappointment or chagrin.

teachers' contention. *See Taylor v. Hayes,* 418 U. S. 488, 501-03 (1974) (lawyer charged with contempt of court should not be tried by the judge before whom the contempt was committed); *Gibson v. Berryhill,* 411 U. S. 564, 578-79 (1973) (Alabama Board of Optometry could not conduct a disciplinary hearing in a case where Board members had a financial stake in the outcome); *Ward v. Village of Monroeville,* 409 U. S. 57 (1972) (mayor of village cannot sit as judge trying traffic offenses when fines provide substantial proportion of village revenues). *See also Pickering v. Board of Education,* 391 U. S. 563 (1968).

In *Hortonville, supra,* the Supreme Court of the United States granted certiorari and reversed the Supreme Court of Wisconsin. The essence of the Supreme Court's holding was that in the absence of a showing that the Board had such a personal or financial stake in the outcome which would induce actual personal bias or animosity, the mere involvement of the Board in the case did not disqualify it as a decision maker.

The following passages, quoted from the opinion, seem apposite:

> "Respondents' argument rests in part on doctrines that have no application to this case. They seem to argue the Board members had some personal or official stake in the decision whether the teachers should be dismissed, comparable to the stake the Court saw in *Tumey v. Ohio,* 273 U. S. 510 (1927), or *Ward v. Village of Monroeville,* 409 U. S. 57 (1972); see also *Gibson v. Berryhill,* 411 U. S. 564 (1973), and that the Board has manifested some personal bitterness toward the teachers, aroused by teacher criticism of the Board during the strike, see, *e.g., Taylor v. Hayes,* 418 U. S. 488 (1974); *Mayberry v. Pennsylvania,* 400 U. S. 455 (1971). Even assuming those cases state the governing standards when the decision-maker is a public employer dealing with employees, the teachers did not show, and the Wisconsin courts did not find, that the Board members had the kind of personal or

financial stake in the decision that might create a conflict of interest, and there is nothing in the record to support charges of personal animosity. The Wisconsin Supreme Court was careful 'not to suggest . . . that the board members were anything but dedicated public servants, trying to provide the district with quality education . . . within its limited budget.' 66 Wis. 2d, at 494. That court's analysis would seem to be confirmed by the Board's repeated invitations for striking teachers to return to work, the final invitation being contained in the letter that notified them of their discharge.

"The only other factor suggested to support the claim of bias is that the School Board was involved in the negotiations that preceded and precipitated the striking teachers' discharge." 49 L.Ed.2d 8-9.

* * *

"Mere familiarity with the facts of a case gained by an agency in the performance of its statutory role does not, however, disqualify a decisionmaker. *Withrow v. Larkin,* 421 U. S. 35, 47 (1975); *Federal Trade Commission v. Cement Institute,* 333 U. S. 683, 700-703 (1948). Nor is a decisionmaker disqualified simply because he has taken a position, even in public, on a policy issue related to the dispute, in the absence of a showing that he is not 'capable of judging a particular controversy fairly on the basis of its own circumstances.' *United States v. Morgan,* 313 U. S. 409, 421 (1941); see also *FTC v. Cement Institute, supra,* 701." 49 L.Ed.2d 9.

* * *

"Respondents have failed to demonstrate that the decision to terminate their employment was infected by the sort of bias that we have held to disqualify other decisionmakers as a matter of federal due process. A showing that the Board was 'involved' in the events preceding this decision, in

light of the important interest in leaving with the Board the power given by the state legislature, is not enough to overcome the presumption of honesty and integrity in policymakers with decisionmaking power." 49 L.Ed.2d 11-12.

\* \* \* "

We regard this as attenuating the Supreme Court cases on which the appellants rely. Applying the rationale of *Hortonville* to this case, we cannot conclude that the Commissioner's participation, limited to the adjudicatory function, is prohibited in the absence of a showing of bias on his part, or a showing that his views so clearly infected the actions of the Disciplinary Hearing Boards as to influence their deliberations. We have made a constitutionally mandated independent examination of the record and find no evidence of this.

(4)

The dismissals were invalid because the Commissioner exercised unlawful selective discipline resulting in disparity of treatment among the strikers.

The Officers' contention that the disciplinary sanction imposed upon them is disparate when compared with sanctions imposed upon others found guilty of similar misconduct and is therefore invalid falls in the face of the general rule that co-defendants in criminal proceedings are not necessarily entitled to receive identical sentences, *James v. State*, 242 Md. 424, 429-30, 219 A. 2d 17, 20-21 (1966); *Hardesty v. State*, 223 Md. 559, 562, 165 A. 2d 761, 763 (1960); *Williams v. State*, 19 Md. App. 204, 208-09, 310 A. 2d 593, 596 (1973); *Grimm v. State*, 6 Md. App. 321, 330-31, 251 A. 2d 230, 236 (1969); *Miller v. State*, 1 Md. App. 653, 656, 232 A. 2d 548, 549 (1967). Even if opinions in criminal cases were regarded as inapposite, there is a legion of cases holding that decisions of administrative agencies are prima facie correct, *Montgomery County v. Public Service Comm.*, 203 Md. 79,

84, 98 A. 2d 15, 18 (1953), and that on judicial review a court may not substitute its judgment for that reached by the agency, *A. H. Smith Sand & Gravel v. Department of Water Resources,* 270 Md. 652, 666-67, 313 A. 2d 820, 828-29 (1974); *Kaufman v. Taxicab Bureau,* 236 Md. 476, 480, 204 A. 2d 521, 523 (1964), *cert. denied,* 382 U. S. 849 (1965), involving an administrative determination by the Department; *Bernstein v. Real Estate Commission,* 221 Md. 221, 230, 156 A. 2d 657, 661-62 (1959), *appeal dismissed,* 363 U. S. 419, *rehearing denied,* 364 U. S. 855 (1960); *Serio v. City of Baltimore,* 208 Md. 545, 551-52, 119 A. 2d 387, 390 (1956).

The appellants place their principal reliance on three cases: *Trans World Airlines, Inc. and Airline Pilots Ass'n Internat'l,* 71-2 ARB ¶ 8544 (Labor Arbitration Awards, 1971-72); *City of New York Human Resources Administration & City Employees Union v. International Brotherhood of Teamsters, Local 237,* Vol. 4, Labor Arbitration in Government, No. 3, Case No. 1002 (1974); *City of Inkster, Michigan & American Federation of State, County & Municipal Employees, Local 290,* Vol. 5, Labor Arbitration in Government, No. 5, Case No. 1295 (1975). As was noted by the court below, these are arbitration cases where the principles applied differ from those applicable to the judicial review of the decision of an administrative agency. All that is required here is that the agency's findings are supported by competent, material and substantial evidence, *Snowden v. City of Baltimore,* 224 Md. 443, 168 A. 2d 390 (1961), and that the action is not arbitrary, capricious or illegal, *Department of Natural Resources v. Linchester,* 274 Md. 211, 224, 334 A. 2d 514, 523 (1975); *Northampton v. Prince George's County,* 273 Md. 93, 100, 327 A. 2d 774, 778 (1974). We conclude that so long as the punishment meted out is not dictated by capriciousness or arbitrariness, and finds support in the facts, it may be imposed on a case-by-case basis.

(5)

The dismissal of the appellant Wayne Harris was arbitrary, capricious and unlawful based on the evidence taken as a whole.

Wayne Harris joined the Union on 30 June 1974, and immediately thereafter became a member of the Steering Committee as the representative of 20 men assigned to a Canine Unit, 19 of whom opposed the strike. He actively opposed the strike at the 11 July meeting of the Committee. His participation in the strike was limited to observing the picket line at the Southwestern District station about 8:00 p.m. on 11 July. He complains that his dismissal was predicated solely on his failure to advise his commanding officer that a strike was imminent.

The following charges were brought against Officer Harris:

"Charge I,
Specification I .... Violation of Rule I — CONDUCT — Section 11, *Rules and Regulations and Manual of Procedure, Police Department, City of Baltimore, 1959*, to wit, — For that on or about July 11, 1974, Police Officer Wayne B. D. Harris, Sr., having knowledge of a planned strike by members of the Baltimore Police Department to begin on July 11, 1974, failed to give information thereof to his commanding officer without delay. [8]

"Charge II,
Specification I .... Violation of Rule I — CONDUCT — Section 14, *Rules and Regulations and Manual of Procedure, Police Department, City of Baltimore, 1959*, to wit, — For that on or

---

8. Section 11 of Rule I, *Rules and Regulations and Manual of Procedure, Police Department, City of Baltimore, 1959*, provides that "Any member of the department, who being present at or having cognizance of any mutinous, seditious, rebellious, or reactionary movement within the department, must use his utmost effort to suppress the same, or knowing or having reason to believe that such movement is to take place, must give information thereof to his commanding officer without delay."

about July 11, 1974, Police Officer Wayne B. D. Harris, Sr., did wilfully disobey General Order 9-73, titled "Establishment of Collective Bargaining," by engaging in, initiating, sponsoring, supporting or directing a strike by members of the Baltimore Police Department. [9]

"Charge III,
Specification I .... Violation of Rule I — CONDUCT — Section 18, *Rules and Regulations and Manual of Procedure, Police Department, City of Baltimore, 1959,* to wit, — For that on or about July 11, 1974, Police Officer Wayne B. D. Harris, Sr., in violation of a lawful Order of the Circuit Court of Baltimore City, did induce members of the Baltimore Police Department to engage in a strike.

"Charge III,
Specification II. .... Violation of Rule I — CONDUCT — Section 18, *Rules and Regulations and Manual of Procedure, Police Department, City of Baltimore, 1959,* to wit, — For that on or about July 11, 1974, Police Officer Wayne B. D. Harris, Sr., in violation of a lawful Order of the Circuit Court of Baltimore City, did encourage members of the Baltimore Police Department to engage in a strike."

---

**9.** Section 14 of Rule I above provides that "No member of the department shall wilfully disobey any lawful command or order, either verbal or written, of any superior or other officer designated to command."

The relevant facts as stipulated by the parties were presented to the Board:

"On July 11, 1974 Officer Wayne Harris was an employee of the Baltimore City Police Department assigned to the Tactical Section. As of that date Officer Harris was also a member of Local 1195 Police Council 27, American Federation of State, County and Municipal Employees, hereinafter referred to as the Union, and was a member of the Union's Steering Committee. A committee composed of Union members selected by the Union membership to decide what job actions would be taken by the Union membership in order to secure desired pay raises and benefits from the City of Baltimore.

"On July 11, 1974 Officer Harris attended a Steering Committee meeting which began about 1:00 o'clock p.m. and was held at Union Headquarters, 305 Monument Street in Baltimore City. The purpose of this meeting was to decide what further job actions would be taken by the Union members. At about 4:00 o'clock p.m. the Steering Committee voted to strike against the Baltimore City Police Department, and the plan was for Southwestern District to go out first and Tactical to follow. After this decision was made most of the attendees were not allowed to leave the room until about 8:00 o'clock p.m.

"Officer Harris was permitted to leave the meeting and did so at approximately 6:00 o'clock p.m. Officer Harris having knowledge of this planned strike by members of the Baltimore City Police Department did not give this information to his commanding officer before the strike began at approximately 8:00 o'clock p.m.

"At approximately 8:00 o'clock p.m. Officer Harris appeared at Southwestern District. The members of Southwestern District and Tactical Section walked off their jobs at about 8:00 o'clock p.m. leaving approximately ninety-eight thousand

residents of the Southwestern District with only one uniformed police officer to protect their lives and property.

"Officer Harris then left for his vacation and remained on vacation during the entire strike.

"At no time during the strike did Officer Harris urge or encourage striking police officers to return to duty and to cease picketing.

\* \* \*

The Board found Officer Harris guilty of charges I and II and the specifications thereto; not guilty of charge III and the specifications thereto.

The short answer to this contention is that Officer Harris was the only officer, or one of two officers, permitted to leave a meeting of the Steering Committee before 8:00 p.m. on 11 July, knowing that a strike had been called. He failed to report the action to his commanding officer, in direct contravention of the regulations of the Department.

He appeared at the Southwestern District headquarters at 8:00 p.m., observed the picket line, and left on his vacation the following morning. Although he returned to Baltimore almost immediately to attend a meeting of the Negotiating Committee, he did not return to duty until after the strike had ended. While it is argued that his dismissal was arbitrary and capricious, the answer is that there was substantial evidence to support a finding that he failed to comply with the Department's regulations in not reporting that a strike was imminent, and that there was evidence from which it could be inferred that he supported the strike when he visited the picket line at Southwestern District on 11 July, made no effort to deter the strikers, and did not report for duty when he returned to Baltimore without determining whether or not his leave had been canceled. *Department of Natural Resources v. Linchester, supra,* 274 Md. at 224; *Snowden v. City of Baltimore, supra,* 224 Md. 443.

*Order affirmed; costs to be paid by appellants.*