499 A.2d 1303

## MARYLAND STATE POLICE

v.

## Gary D. RESH.

## No. 214, Sept. Term, 1985.

Court of Special Appeals of Maryland.

Nov. 12, 1985.

Certiorari Denied Jan. 30, 1986.

James J. Doyle, III, Asst. Atty. Gen., Pikesville (Stephen H. Sachs, Atty. Gen., on brief), Baltimore, for appellant.

Ralph M. Burnett (Burnett, Eiswert & Janes, P.A., on brief), Oakland, for appellee.

Argued Before ROSALYN B. BELL, KARWACKI and ROBERT M. BELL, JJ.

KARWACKI, Judge.

The question presented in this case is whether the Law Enforcement Officers' Bill of Rights (LEOBR), Maryland Code (1957, 1982 Repl.Vol.), Article 27, § 727 et seq., barred an investigation initiated by a law enforcement agency of the extent of the force used by one of its police officers in effecting an arrest. As a result of such an investigation Trooper First Class Gary D. Resh, the appellee, was charged by his superior officers of the Maryland State Police with violation of the rules and regulations of that department concerning the use of unnecessary and excessive force in effecting an arrest. We shall hold that the LEOBR did not bar such investigation. Consequently, we agree with the appellant, Maryland State Police, that the Circuit Court for Garrett County erroneously enjoined the administrative hearing of those charges.

### The Facts

The appellee has been employed as a Maryland State Trooper for approximately 12 years. On January 29, 1984 at about 2:00 p.m., while Trooper Resh was on routine patrol west of Grantsville, in Garrett County, a car driven by Kenneth James Zimmerman came out of a tavern parking lot across the westbound lane of Route 40, and headed east on Route 40. Resh, who was westbound on Route 40, was forced to slow down so that Zimmerman's car could pass in front of him. Resh watched as the car proceeded past him in the opposite direction. He noticed that the car, which he thought he recognized as belonging to an area resident, bore a Pennsylvania license plate. Resh, rightfully suspicious, turned his patrol car around, and caught up with the car driven by Zimmerman, which by this time had

turned on to a dirt road which leads into Pennsylvania. After Resh turned on his police cruiser's emergency lights, Zimmerman pulled to the side of the road immediately. Resh alighted from his car and asked Zimmerman for his license and registration. Zimmerman could not produce either one. Resh believed Zimmerman to be intoxicated and told him to get out of his car and to wait in the patrol car. Zimmerman complied.

Six other people were in the car that Resh stopped. Larry Wilt and his wife were in the front seat, and Ronald Bittinger and three children were in the back seat. After Zimmerman got into the patrol car, Resh checked the Pennsylvania license plate on the car to see if it had been stolen. He then radioed for a tow truck to take the car operated by Zimmerman back to the station for storage until ownership could be established.

While Resh was taking care of these matters, Larry Wilt repeatedly came up to Resh in the patrol car to explain that the car was his, that he had put the Pennsylvania license plate on the car, and that it was he who had persuaded Zimmerman to drive since he (Wilt) was also intoxicated. Wilt was insistent that Zimmerman be released and allowed to continue on to Pennsylvania. Resh twice got out of the patrol car and instructed Wilt to return to the other car. Even Wilt's wife joined in trying to get Wilt to sit down and to refrain from trying to get Zimmerman released.

Resh then made several unsuccessful attempts to have the police dispatcher contact friends and relatives of the Wilts so that they might come and take them home. Shortly thereafter, a tow truck arrived, and Resh told Wilt and Bittinger that they would have to walk back to the tavern, and that he would take Wilt's wife and the children to the tavern where they could meet relatives who could take them all home.

As Resh began to pull back onto the road to drive to the tavern, he heard Wilt yelling and saw in his rear view mirror that Wilt was waving his arms in a way that looked

like Wilt wanted Resh to stop. Resh did stop and got out of his car. Resh said that Wilt rushed toward him with his hands clenched. Resh claimed that he believed that Wilt was going to hit him, and Resh punched Wilt in the face. The force of the blow knocked Wilt backwards and on to the road. Wilt's head hit the road, rendering him unconscious. Resh then turned the unconscious Wilt face down onto the roadway, handcuffed him, and placed him under arrest. Resh called for medical help. A State Police helicopter responded and transported Wilt to Memorial Hospital in Cumberland, Maryland. As of February 11, 1985, when this case was tried below, Wilt had not regained consciousness.

On the day of the incident, Detective Sergeant John McGowan was directed by the Maryland State Police Cumberland Barracks Commander, First Lieutenant W.R. Presley, to proceed to Memorial Hospital to investigate the circumstances surrounding the severe injury suffered by Larry Wilt.

McGowan began interviewing witnesses to the incident as soon as he arrived at Memorial Hospital. He interviewed Wilt's wife and one of the emergency room doctors. In the following weeks, all eyewitnesses were interviewed by either McGowan or by another Maryland State Police Officer, Sergeant Hinnant, as were residents of the area where Wilt was injured.

Under Chapter 28, Section I, Subsection 6–2 of the Maryland State Police Manual, promulgated by the Superintendent of the appellant for the governance of the police employees of the Department pursuant to Md.Code (1957, 1979 Repl.Vol.), Art. 88B, § 15(a), a trooper must submit a detailed report in every instance in which a person is injured as a result of any force or violence associated with an arrest. The appellee filed such a report on January 31, 1984. The injury report is standard operating procedure, and it facilitates a State Police administrative inquiry which is conducted after every such incident. The administrative

review is conducted whether or not a complaint has been lodged. The purpose of the investigation is to hold the troopers accountable for their actions while they are on duty. It is a managerial tool which helps to ensure that troopers do not abuse their authority.

By March 20,. 1984, the investigating officers of the appellant had determined that there was sufficient information indicating that Resh had used excessive force, and on that day they issued a "Notification of Complaint" to Resh. The notice stated:

A complaint has been lodged concerning an incident in which you were alleged to have been involved. The details of the complaint as they are known are as follows: On January 28, 1984 at approximately 2:00 P.M., you were allegedly involved with arresting Kenneth James Zimmerman for driving while intoxicated. It is alleged that during the time you were involved in making the arrest, you struck Larry DeWayne Wilt, who had been a passenger in the vehicle operated by Zimmerman.

Resh signed the complaint signifying that he had received a copy of it. Resh also signed page two of the complaint, signifying that he understood his rights under the LEOBR, and that he agreed to "waive all rights afforded by the LEOBR regarding interrogation."

Resh had been given the "Notification of Complaint" in compliance with § 728(b)(5) of the LEOBR which requires that "[T]he law-enforcement officer under investigation shall be informed in writing of the nature of the investigation prior to any interrogation."

Following the questioning of Resh, the Maryland State Police continued their investigation into the possible excessive use of force by Resh, and on October 6, 1984 formally notified Resh that charges were being brought. Resh was charged with the unnecessary use of force, the excessive use of force, and assault and battery in connection with the arrest of Larry Wilt.

Prior to any administrative adjudication of those charges, Resh filed a complaint on November 15, 1984 in the Circuit Court for Garrett County requesting a permanent injunction against the Maryland State Police from proceeding on those charges. The court held a hearing on February 11, 1985, and on February 20, 1985 issued its written opinion and order permanently enjoining the appellant from proceeding on the charges against Resh.

## The Law

The LEOBR was enacted in 1974 by the General Assembly to ensure that law enforcement officers were accorded certain procedural guarantees during any investigation and subsequent hearing which could result in a disciplinary sanction. *DiGrazia v. County Exec. for Mont. Co.*, 288 Md. 437, 418 A.2d 1191 (1980); *Hoyt v. Police Comm'r*, 279 Md. 74, 367 A.2d 924 (1977); *Abbott v. Administrative Hearing Bd.*, 33 Md.App. 681, 366 A.2d 756 (1976). Section 728(b) of the LEOBR provides: "Whenever a law-enforcement officer is under investigation or subjected to interrogation by a law-enforcement agency, for any reason which could lead to disciplinary action, demotion or dismissal, the investigation or interrogation shall be conducted under the following conditions...." This subsection of the statute then enumerates 14 conditions under which the interrogation or investigation shall be conducted. These include: restrictions as to the time, place, and length of the interrogation (subsections one, two and six); a requirement that the officer under investigation be given the names of all persons at the interrogation (subsection three); a provision against threats of dismissal but not against the requirement of blood alcohol tests or other tests (subsection seven); and provisions regarding the keeping of records of the interrogation and access to those records, and prohibitions against the insertion of adverse materials into the officer's file without giving the officer an opportunity to review the material (subsections eight and twelve). Other procedural safeguards accorded to law enforcement officers include

the right to counsel at an interrogation (subsection 10), and a provision that an officer may not be prohibited from bringing a suit arising out of his official duties (subsection 11).

■ The narrow issue presented in this appeal is the proper construction of § 728(b)(4) of the LEOBR. This subsection provides:

> A complaint against a law-enforcement officer, alleging brutality in the execution of his duties, may not be investigated unless the complaint be duly sworn to by the aggrieved person, a member of the aggrieved person's immediate family, or by any person with firsthand knowledge obtained as a result of the presence at and observation of the alleged incident, or by the parent or guardian in the case of a minor child before an official authorized to administer oaths. An investigation which could lead to disciplinary action under this subtitle for brutality may not be initiated and an action may not be taken unless the complaint is filed within 90 days of the alleged brutality.[1]

Our primary focus in construing this statute is to ascertain and effectuate the legislative intention. *In re Arnold M.*, 298 Md. 515, 520, 471 A.2d 313 (1984); *Celanese Corp. v. Comptroller*, 60 Md.App. 392, 397, 483 A.2d 359 (1984). To that end, this Court must consider the statute's legislative history, administrative interpretations, and the statute's plain purpose. Further, the statute's language must

---

1. When the LEOBR was originally enacted by Chapter 722 of the Acts of 1974 this subsection provided: "No complaint against a law enforcement officer, alleging brutality in the execution of his duties, shall be investigated unless the complaint be duly sworn to before an official authorized to administer oaths." The subsection was amended by Chpater 366 of the Acts of 1977 to its present form.

   "Brutality" is not defined in the LEOBR. The term is defined in the rules promulgated by the Superintendent of the appellant as follows: "Brutality is considered to include any situation wherein a law enforcement officer, while acting in his official capacity, resorts to the use of force which is unnecessary in its origin and application; or if force is deemed necessary, is excessive in its application. Chapter 5, Section 11, Subsection 1-0 of the Maryland State Police Manual.

be taken in context and in relation to all of its provisions. *Department of State Planning v. Hagerstown,* 288 Md. 9, 14, 415 A.2d 296 (1980). Statutory construction which leads to results that are unreasonable, illogical, or contrary to common sense is to be avoided. *Cider Barrel Mobile Home Court v. Eader,* 287 Md. 571, 414 A.2d 1246 (1980); *Woodmont Country Club v. Montgomery Co.,* 61 Md.App. 229, 236, 486 A.2d 218 (1985).

By the plain language of the statute, § 728(b)(4) applies when a member of the enumerated class of persons files a sworn complaint against an officer alleging brutality in the execution of that officer's duties. The General Assembly has directed that a police agency may not investigate an officer pursuant to a complaint lodged against him unless the complainant is within the class specified in § 728(b)(4), and unless the complaint is sworn to by the aggrieved person. We do not believe that subsection has any application where, as in the case *sub judice,* the investigation is generated by a police agency to determine whether its rules and regulations governing the conduct of its officers in the performance of their sworn duties have been observed.

Rather, this subsection is designed to protect law enforcement officers from being subjected to the harassment of frivolous complaints received from outside the police agency. Before an investigation of such a complaint may begin, the brutality complaint must be made by either the aggrieved person or by that person's immediate family, or by any person with firsthand knowledge of the alleged brutality. Restricting the class eligible to file brutality complaints helps to ensure that frivolous complaints will not be filed. Requiring that complaints be under oath encourages candor on the part of the complainant.

In the instant case, no complaint alleging brutality by Resh was filed by anyone. The charges lodged against him by his superior officers were based on the internal investigation of the incident in which Larry Wilt was injured.

Resh maintains that because no complaint was sworn to and filed pursuant to § 728(b)(4), the appellant was powerless to initiate an internal investigation of the incident which resulted in serious injury to Larry Wilt. We decline to ascribe such an intention to the Legislature in enacting this provision. The Superintendent of the Maryland State Police, as well as the chief of any other law enforcement agency, must have the ability to conduct the affairs and operations of his department in an effective and efficient manner. The Legislature intended no less, and when enacting the LEOBR specifically recognized the necessity of that managerial authority. Section 728(c) of the LEOBR states:

This subtitle does not limit the authority of the chief to regulate the competent and efficient operation and management of a law-enforcement agency by any reasonable means including but not limited to, transfer and reassignment where that action is not punitive in nature and where the chief determines that action to be in the best interests of the internal management of the law-enforcement agency.

Moreover, § 728(c) must be read in connection with Maryland Code, *supra,* Article 88B, governing the operation of the Maryland State Police. *Police Comm'r v. Dowling,* 281 Md. 412, 379 A.2d 1007 (1977). The Legislature has therein defined the mission of that police agency in these terms:

The Department shall have the general duty to safeguard the lives and safety of all persons within the State, to protect property, and to assist in securing to all persons the equal protection of the laws. Specifically, this duty includes the responsibilities: to preserve the public peace; to detect and prevent the commission of crimes; to enforce the laws and ordinances of the State and local subdivisions; to apprehend and arrest criminals and those who violate or are lawfully accused of violating such laws and ordinances; to preserve order at public places; to

maintain the safe and orderly flow of traffic on public streets and highways; to cooperate with and assist law enforcement agencies in carrying out their respective duties; and to discharge its duties and responsibilities with the dignity and manner which will inspire public confidence and respect.

Md.Code, *supra*, Article 88B, § 3. In that same Article, the General Assembly has directed that, "The affairs and operations of the Department shall be supervised and directed by a Superintendent" (§ 14), that the Superintendent "shall have the power to make any rules necessary to promote the effective and efficient performance of the duties of the Department and to insure the good government of the Department and its employees" (§ 15), and that the Superintendent shall regulate the "conduct, training, discipline, and procedure for all employees of the Department" (§ 15(b)(8)). These provisions of Md.Code, *supra*, Article 88B, when read in *pari materia* with § 728(c), amply support the Superintendent's authority to promulgate the rules requiring a detailed report from a trooper where a prisoner is injured in the course of an arrest by him and authorizing an investigation of such an incident. Where such investigation discloses a basis for disciplinary sanctions against the arresting officer, he is entitled to a hearing on any charges before a sanction may be imposed. § 730 of the LEOBR. During the course of the investigation and at the hearing on any charges the panoply of rights guaranteed him under § 728(b) of the LEOBR are applicable.

In summary we conclude that § 728(b)(4) of the LEOBR was never intended to bar the initiation of an investigation into brutality on the part of a law enforcement officer by the agency which employs him. Since the charges against the appellee grew out of such an investigation by the appellant, their adjudication should proceed.

JUDGMENT REVERSED; COSTS TO BE PAID BY THE APPELLEE.